# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 2:21-CR- 04026-BCW |
| ) | |
| ) | |
| DAMIEN MICHAEL ROTTER, ) | |
| ) | |
| Defendant. ) | |

## REPORT AND RECOMMENDATION

Pending before the Court is defendant Damien Michael Rotter's Motion to Suppress Evidence. (Doc. 21). The Government has filed its suggestions in opposition to the motion. (Doc. 23). Mr. Rotter filed a reply brief on September 24, 2021. (Doc. 24). The Court held a hearing on this matter on September 30, 2021. (Doc. 31). The issue is now ripe for consideration. For the reasons that follow, it is recommended that the motion be DENIED.

## I. Findings of Fact

On the basis of the evidence presented at the evidentiary hearing, the Court submits the following proposed findings of fact:

1. Officer Jarod Phelps has served as an officer with the Jefferson City Police Department ("JCPD") for 14 years. (Tr. 3:16-22). He is currently assigned to the Community Action Team, JCPD's Street Crimes Unit and Special Programs Unit. (Tr. 3:23-25).

2. Officer Paul Gash has served as an officer with the JCPD for 17 years. (Tr. 32:19-24). Officer Gash has 24 years of law enforcement service, including with a sheriff's office prior to JCPD. (Tr. 32:25-33:5). He is currently assigned as a K-9 officer with the

Community Action Team, a problem-driven community team that deals with special projects and special problem areas in the community. (Tr. 33:6-11).

3. In the early evening hours on October 29, 2020, while conducting routine patrol in an area of known drug activity, Officers Phelps and Gash observed a blue Toyota Prius on Riverside Drive crossing westbound over Rivera Street. (Tr. 4:23-5:20, 7:2-12, 31:22-24, 34:7-20, 35:21-25, 37:1).

4. Officers Phelps and Gash believed from their training and experience that the blue Prius had run the stop sign facing east on Riverside Drive that controls traffic flowing from that direction across Rivera Street. (Tr. 4:7-22, 7:20-8:6, 15:23-16:8, 33:15-34:6, 35:24-36:9, 44:3-11).

5. Officer Gash activated the patrol car's emergency lights and sirens and began to follow the vehicle to initiate a traffic stop. (Tr. 11:16, 23:5-6, 24:25-25:17, 49:13-17).

6. The driver of the blue Prius did not immediately pull over, continuing roughly three blocks until he turned left/southbound and stopped on Ash Street. (Tr. 11:15-18, 12:15-20, 26:16-20, 27:16-25, 50:14-25, 51:8-16).

7. While following the blue Prius but before it pulled over, Officer Phelps recognized one of the vehicle's passengers as Mr. Rotter. (Tr. 11:25-12:3, 12:25-13:2, 38:12-17).

8. Both Officers Phelps and Gash know Mr. Rotter from his prior weapons offenses, and recognize Mr. Rotter as a person who has previously fled from police. (Tr. 13:6-8, 38:21-25).

9. Officers Phelps and Gash observed Mr. Rotter moving around in the back seat and suspected that he might be trying to conceal a firearm. (Tr. 12:24-13:8, 38:16-20, 39:1-4).

10. After the blue Prius came to a complete stop, Officer Phelps approached Mr. Rotter and observed him leaned over in the back seat as if he were hiding something along the floor of the passenger compartment or under the seat in front of him. (Tr. 13:9-15). Officer Phelps immediately ordered and then helped Mr. Rotter out of the vehicle and handcuffed him. (Tr. 13:17-20, 39:5-9).

11. While handcuffing Mr. Rotter, Officer Phelps discovered a glass pipe in Mr. Rotter's left hand. (Tr. 13:24-25). Officer Phelps conducted a further search of Mr. Rotter which revealed narcotics in Mr. Rotter's pocket. (Tr. 13:25-14:2).

12. Officer Gash meanwhile conducted a search of the vehicle in the passenger compartment where Mr. Rotter had been seated and discovered a magazine with seven .380 rounds in it under the back of the front passenger's seat, just in front of where Mr. Rotter had been seated. (Tr. 39:10-16). Upon further search, Officer Gash found a Smith & Wesson .380 pistol pushed under the same seat, just in front of where Mr. Rotter had been seated. (Tr. 39:16-18).

13. The driver of the vehicle reported to Officers that he did not immediately pull over after the Officers activated the patrol car's emergency lights and sirens because "he had an armed gunman in his backseat telling him not to stop for the police department." (Tr. 30:11-13, 30:24-31:1).

## II. Discussion

A federal grand jury indicted Mr. Rotter on a charge of Felon in Possession of a Firearm on April 14, 2021. (Doc. 2). Mr. Rotter filed his Motion to Suppress Evidence on August 27, 2021, challenging the constitutionality of the seizure of the blue Prius. (Doc. 21).

A. Legal standard

"[A] traffic stop is a seizure within the meaning of the Fourth Amendment" and "must be reasonable to pass constitutional muster." *United States v. Wright*, 512 F.3d 466, 471 (8th Cir. 2008). "'Because it is subject to Fourth Amendment protections against unreasonable searches and seizures, a traffic stop must be supported by either reasonable suspicion or probable cause' to believe that the driver has committed a traffic violation." *United States v. Navarette*, 996 F.3d 870, 874 (8th Cir. 2021) (quoting *United States v. Soderman*, 983 F.3d 369, 374 (8th Cir. 2020)); *see also United States v. Holly*, 983 F.3d 361, 364 (8th Cir. 2020) (quoting *United States v. Washington*, 455 F.3d 824, 826 (8th Cir. 2006)) ("Under the Fourth Amendment, a traffic stop is reasonable if it is supported by either probable cause or an articulable and reasonable suspicion that a traffic violation has occurred."); *United States v. Cox*, 992 F.3d 706, 709 (8th Cir. 2021) (quoting *United States v. Martin*, 411 F.3d 998, 1000 (8th Cir. 2005)) ("A traffic stop generally must be supported by 'at least a reasonable, articulable suspicion that criminal activity has occurred or is occurring,' and 'a traffic violation—however minor—creates probable cause to stop the driver of a vehicle.'"). "[T]he determinative question is not whether a traffic violation [has] actually occurred, but 'whether an objectively reasonable police officer could have formed a reasonable suspicion that [the driver] was committing a code violation.'" *Cox*, 992 F.3d at 709 (quoting *Martin*, 411 F.3d at 1001. The Supreme Court has determined that passengers in a vehicle, as well as the driver, are subject to a seizure during a traffic stop. *Brendlin v. California*, 551 U.S. 249, 257-58 (2007). Accordingly, "a passenger may bring a Fourth Amendment challenge to the legality of a traffic stop." *Id.* at 559.

**B. Officers Phelps and Gash had reasonable suspicion to believe that the driver of the blue Prius committed a stop sign violation.**

Mr. Rotter concedes that he was as a passenger in the blue Prius that Officers Phelps and Gash pulled over on the evening of October 29, 2020. (Doc. 21 at 2, ¶ 1). Mr. Rotter concedes that there is a stop sign at the northeast corner of Riverside Drive and Rivera Street in Jefferson City, Missouri, which regulates westbound traffic on Riverside Drive. (*Id.* at 1, ¶ 2). He further concedes that, "[s]hould the officers have observed the blue Prius running the stop sign, the stop of the vehicle would be constitutionally permissible." (*Id.* at 2, ¶ 2). There ends the concessions.

Mr. Rotter argues that the patrolling Officers could not have seen the northeast-corner stop sign at Riverside Drive and Rivera Street because "[a]t the time the blue Prius was observed to cross Riviera [sic] Street, the stop sign that officers Phelps and Gash claim to have observed the vehicle fail to stop at was not visible." (*Id.* at 3, ¶ 3). Mr. Rotter asserts that "[o]bstructions and geography of the roadways prevented the officers from being able to see whether the vehicle stopped or did not stop at the stop sign regulating westbound traffic on Riverside Drive." (*Id.*). Mr. Rotter states that "[a]n objectively reasonable police officer could not have formed any opinion as to whether the blue Prius stopped at the stop sign given the relative positioning of the vehicles." (*Id.* at 3, ¶ 4).

The Government counters, contending that the Officers' "observation of the Prius led them to form a reasonable suspicion that the vehicle ran a stop sign." (Doc. 23 at 3). Further, the Government offers that, even if the Officers' observation of the vehicle's actions at the stop sign were incomplete or obstructed, the Officers' "observation of the Prius going through the intersection gave them a reasonable suspicion that the Prius ran the stop sign in violation of Mo. Rev. Stat. 300.270." (*Id.*). An affidavit accompanying the Criminal Complaint records that the Officers "observed a blue Toyota Prius run a stop sign from Riverside to Riviera [sic] street." (Doc. 1-1 at ¶ 4). Both Officers Phelps and Gash testified at the evidentiary hearing that they

believe, based on their training and experience, that the blue Prius ran the stop sign. (Tr. 4:7-22, 7:20-8:6, 15:23-16:8, 33:15-34:6, 35:24-36:9, 44:3-11).

The ultimate question is not whether a traffic violation actually occurred, but in the totality of the circumstances at the time, "whether an objectively reasonable police officer could have formed a reasonable suspicion that the driver was committing a code violation." *Cox*, 992 F.3d at 709 (quoting *Martin*, 411 F.3d at 1001).

The Court recommends a finding that the facts here meet that minimal requirement. While Mr. Rotter contends the Officers could not have formed an opinion as to whether the blue Prius stopped at the stop sign, Officers Phelps and Gash contend that they did in fact form an opinion. Both Officers stated under oath that they "observed" – whether or not they literally *saw* – the blue Prius run the stop sign. Even considering, as Mr. Rotter contends, that the dashcam video depicts a view of the area around the stop sign that is obscured by distance, geography, or obstructions, a reasonable officer in these circumstances could have formed a suspicion that the driver had run the stop sign based on factors such as the driver's rate of speed as he crossed the intersection. Moreover, Mr. Rotter's assertion that the Officers could not observe the stop sign at the time immediately prior to the stop discounts the objective reality that these officers have routinely patrolled this area for over a decade and knew about the stop sign despite its absence from the dashcam video. "'Even an officer's incomplete initial observations may give reasonable suspicion for a traffic stop,' and '[m]istakes of law or fact, if objectively reasonable, may still justify a valid stop.'" *Holly*, 983 F.3d at 364.

The Officers knew the area and intersection intimately. Both Officers testified to conducting innumerable traffic stops in their careers, including many for stop sign violations, and many of those at the very intersection in question. Under the totality of the circumstances, there

was nothing unreasonable about the Officers' conclusions. Accordingly, the Court recommends a finding that reasonable suspicion existed for Officers Phelps and Gash to believe that the driver committed a traffic violation. They were therefore permitted to initiate a stop of the blue Prius.

### C. An additional traffic violation also justified the stop of the blue Prius.

Mr. Rotter argues that "[t]he sole reason for the initiation of the traffic stop of the blue Prius was the alleged stop sign violation." (Doc. 21 at 2, ¶ 2). The Government submits additionally that, by continuing to drive instead of immediately pulling over, the driver violated Missouri law presuming a driver to be resisting arrest and fleeing from an officer if they fail to stop for emergency lights/sirens (Mo. Rev. Stat. § 570.150) and mandating that drivers yield the right-of-way and immediately make way for vehicles with activated emergency lights and sirens (Mo. Rev. Stat. § 304.022). (Doc. 23 at 4-5). This Court concurs with the Government. The blue Prius continued for multiple blocks without yielding to the patrol car's emergency signals despite multiple opportunities and ample locations to do so. (Tr. 11:15-18, 12:15-20, 26:16-20, 27:16-25, 50:14-25, 51:8-16). The Officers therefore had probable cause to believe that the driver had violated additional Missouri traffic laws by failing to yield to their signals. *See United States v. Smith*, 990 F.3d 607, 612 (8th Cir. 2021) (internal citation omitted) (quoting *Wright*, 512 F.3d at 471) ("Any traffic violation, however minor, provides probable cause for a traffic stop."). Accordingly, this Court recommends a finding that the traffic stop was further and independently justified by the driver's refusal to yield to the Officers' emergency signals.

### D. The evidence obtained from the search of Mr. Rotter and his vicinity should not be suppressed.

Mr. Rotter argues that the evidence obtained in the stop and search of the vehicle "is subject to suppression as 'fruit of the poisonous tree.'" (Doc. 21 at 3, ¶ 6) (citing *Wong Sun v. U.S.*, 371

U.S. 471 (1963)). This Court recommends denying Mr. Rotter's Motion because the evidence obtained from the vehicle does not constitute fruit of the poisonous tree.

The fruit of the poisonous tree doctrine does not apply here because the stop of the blue Prius and the search of Mr. Rotter and his immediate area in the passenger compartment were justified. Therefore, the evidence discovered in the vehicle was not "derivative of an illegality or 'fruit of the poisonous tree.'" *United States v. Tuton*, 893 F.3d 562, 568 (8th Cir. 2018) (quoting *Segura v. United States*, 468 U.S. 796, 804 (1984)). Accordingly, this Court recommends a finding that the stop of the vehicle and the search of Mr. Rotter and his vicinity were justified and that the evidence recovered therefrom should not be suppressed.

### III. Conclusion

For the foregoing reasons, IT IS RECOMMENDED that the District Judge, after making an independent review of the record and applicable law, enter an order DENYING Defendant Damien Michael Rotter's Motion to Suppress Evidence.

Counsel are reminded that each party has fourteen (14) days from the date of receipt of a copy of this Report and Recommendation within which to file and serve objections. A failure to file and serve objections by this date shall bar an attack on appeal of the factual findings in the Report and Recommendation that are accepted or adopted by the District Judge, except on the grounds of plain error or manifest injustice.

Dated this 1st day of October 2021, at Jefferson City, Missouri.

*Willie J. Epps, Jr.*
Willie J. Epps, Jr.
United States Magistrate Judge